**REGULAR ROUTE COMMON CARRIER CONFERENCE OF the COLORADO MOTOR CARRIERS ASSOCIATION; Northwest Transport Service, Inc.; and Trans-Western Express, Ltd., Petitioners-Appellants,**

v.

**PUBLIC UTILITIES COMMISSION OF the STATE OF COLORADO; The Contract Carriers Conference of the Colorado Motor Carriers Association; Ashton Trucking Company; Jim Chelf, Inc., and Leprino Transportation Company, Respondents-Appellees.**

**The CONTRACT CARRIERS CONFERENCE OF the COLORADO MOTOR CARRIERS ASSOCIATION; Ashton Trucking Company; Jim Chelf, Inc.; and Leprino Transportation Company, Petitioners-Appellees,**

v.

**PUBLIC UTILITIES COMMISSION OF the STATE OF COLORADO; Regular Route Common Carrier Conference of the Colorado Motor Carriers Association; Northwest Transport Service, Inc.; and Trans-Western Express, Ltd., Respondents-Appellants.**

No. 87SA123.

Supreme Court of Colorado,
En Banc.

Sept. 12, 1988.

Rehearings Denied Oct. 11, 1988.

Jones, Meiklejohn, Kehl & Lyons, John P. Thompson, Denver, for Regular Route Common Carrier Conference, Northwest Transport Service, Inc., and Trans–Western Exp., Ltd.

John J. Conway, Denver, for Contract Carriers Conference of the Colorado Motor Carriers Ass'n, Ashton Trucking Co., Jim Chelf, Inc., and Leprino Transp. Co.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Eugene C. Cavaliere, Deputy Atty. Gen., Denver, for Colorado Public Utilities Comn.

QUINN, Chief Justice.

This case is before us on direct appeal by the Public Utilities Commission (Commission) and individual motor vehicle common carriers from a judgment of the Denver District Court.[1] In a judicial review proceeding involving various rules adopted by the Commission with respect to contract carriers, the district court upheld certain rules and set others aside. The individual common carriers and the Regular Route Common Carrier Conference of the Colorado Motor Carriers Association (common carriers) appeal from that part of the judgment upholding two rules which the common carriers challenged on judicial review, and the Commission and the common carriers appeal from that part of the judgment setting aside various rules which the individual contract carriers and the Contract Carriers Conference of the Colorado Motor Carriers Association (contract carriers) challenged on judicial review. We affirm that part of the judgment upholding the two rules challenged by the common carriers and reverse that part setting aside the several rules contested by the contract

---

1. This court has jurisdiction of this case pursu-

ant to section 40–6–115, 17 C.R.S. (1984).

carriers in the judicial review proceeding in the district court.

## I.

Pursuant to its statutory authority, §§ 40-2-108 and 40-11-105(1), 17 C.R.S. (1984), the Commission commenced a rule-making proceeding in November 1984 in order to revise and amend various rules governing contract carriers which, in Colorado, are regulated by the Contract Motor Carriers Act, §§ 40-11-101 to -117, 17 C.R.S. (1984 & 1987 Supp.). A contract carrier generally furnishes transportation services for pay at the convenience of, and subject to a satisfactory agreement with, its customer. *See Public Utilities Commission v. DeLue*, 175 Colo. 317, 321, 486 P.2d 1050, 1052 (1971).[2] Common carriers are regulated by the Motor Vehicle Carriers Act, §§ 40-10-101 to -120, 17 C.R.S. (1984 & 1987 Supp.), and, in contrast to contract carriers, are required by law to provide transportation services to all members of the public upon payment of the approved rate. *See McKay v. Public Utilities Commission*, 104 Colo. 402, 413, 91 P.2d 965, 970 (1939).

During the rulemaking proceeding, various common carriers and contract carriers filed objections, suggested modifications, and comments concerning the proposed rules. A hearing on the rules was conducted by a hearing examiner on January 30 and February 19, 1985, during which testimony and exhibits were received into evidence. Written position statements were subsequently filed by the common carriers, the contract carriers, and the Commission staff.

On October 7, 1985, the hearing examiner rendered a recommended decision in which he modified certain of the proposed rules and recommended their adoption. All parties to the hearing were served with copies of the hearing examiner's recommended decision and, pursuant to section 40-6-109(2), 17 C.R.S. (1984), were given twenty days within which to file exceptions. The common carriers, the contract carriers, and the Commission staff filed exceptions to the recommended decision. The Commission granted the exceptions filed by the Commission staff, as well as some of the exceptions filed by the contract carriers, and on June 3, 1986, adopted the rules in their final form.

Since this appeal centers on various parts of Rules 7, 16, and 17, we set out in full those parts of the rules at issue. Rule 7 is entitled "Equipment" and part (c) provides as follows:

Any contract carrier permitting any person, firm, or corporation to operate vehicles under his or its permit, either with or without the authorization of the Commission, shall be responsible for any violations of the public utilities law or any of the rules and regulations of the Commission committed by such user.

Rule 16, which is entitled "Rates and Charges," is made up of parts (a), (b), (c), and (d). Parts (a), (b), and (c), provide as follows:

(a) Every contract carrier by motor vehicle operating in intrastate commerce and competing with any authorized motor vehicle common carriers shall charge and receive for the transportation of persons and property not less than the minimum rates and charges applicable to such contract carrier. The minimum rates and charges shall not be less than the rates prescribed by the Commission for motor vehicle common carriers for substantially the same or similar service.

(b) When competing with any two or more connecting motor vehicle common

---

**2.** "Contract carrier by motor vehicle" is defined in the Contract Motor Carriers Act to include: every corporation, person, firm, association of persons, lessee, or trustee or any receiver or trustee appointed by any court, other than motor vehicle carriers as defined by section 40-10-101(4)(a) [pertaining to "common carriers"], owning, controlling, operating, or managing any motor vehicle in the business of transporting persons or the property of others or of transporting sludge and fly ash to and from disposal sites, for compensation or hire, over any public highway of this state between fixed points or over established routes or otherwise, by special contract or otherwise.

§ 40-11-101(3), 17 C.R.S. (1987 Supp.).

carriers who are providing substantially the same or similar service and who have on file with the Commission a tariff of joint through rates based upon the through mileage prescribed in any Order of the Commission fixing the rates of motor vehicle common carriers, every contract carrier by motor vehicle shall charge not less than the minimum rates prescribed by the Commission, which shall not be less than those provided in any such joint tariff applicable to the points served. If, however, a single line rate is in effect for a scheduled motor vehicle common carrier between the same points, the single line rate, if less than the joint line rate, shall be the minimum for the contract carrier.

(c) The Commission may, at any time after hearing, change any tariff or rate of any contract carrier competing with a motor vehicle common carrier providing substantially the same or similar service, and may fix the actual rates to be charged by any contract carrier.

Part (d) of Rule 16 was added by the hearing examiner in his recommended decision, and the second sentence of the rule was subsequently modified by the Commission and, as modified, adopted by the Commission in the following form:

(d) A contract carrier shall be deemed to be in competition with a common carrier who is providing substantially the same or similar service when regular route, scheduled, line haul, common carrier service is available for the same or similar commodities between the same points and locations proposed in the application for a permit. Although they may be included among the factors to be considered in determining whether or not the services of contract carriers are distinctly different or superior to those provided by authorized common carriers, the fact that a contract carrier provides distinctly different or superior service to that offered by authorized common carriers by providing, for example, more frequent service, 24-hour service, ancillary non-transportation services, or service to a particular location, for example, does

not necessarily render the service of the contract carrier noncompetitive.

Rule 17 is entitled "Tariffs to be Filed" and provides in parts (a), (b), and (c) as follows:

(a) Every contract carrier shall file with the Commission, within the time and in the form prescribed, and shall keep on file with the Commission at all times, tariffs which clearly reveal the rates and charges being assessed for services performed.

(b) Every contract carrier competing with any scheduled motor vehicle common carrier shall file tariffs of rates and charges which shall not be less than the lowest rate or charge prescribed by the Commission for any competing, scheduled, motor-vehicle common carrier for substantially the same or similar services.

(c) Every Class B contract carrier by motor vehicle, when transporting commodities other than explosives; milk and cream; heavy and bulk commodities; oil-field equipment; water; livestock; farm products; brick; cement; cinders; clay or shale; lime; and gypsum or gypsum products (all listed commodities as described in Case 1585, Part I, Section B-2, Item 75, Part I, Section F, and all parts of Section[s] II and III), in competition with any duly authorized motor vehicle common carrier operating over regular routes or between fixed points, shall charge and collect rates and charges which shall not be less than the percentage increment established by the Commission, which increment shall be greater than the rates prescribed in Case 1585 [which is the Commission's ongoing rate docket] for the scheduled common carrier or carriers, but in no case more than 20 percent greater.

After the Commission adopted the rules in their final form, the common carriers and the contract carriers sought judicial review in the Denver District Court. The common carriers challenged the second sentence of Rule 16(b) and all of Rule 17(b), but the district court rejected the challenges and upheld both rules as consistent

with the rulemaking authority granted to the Commission by section 40–11–105(2), 17 C.R.S. (1984), of the Contract Motor Carriers Act. The contract carriers challenged Rule 7(c), Rule 16(a), the first sentence of Rule 16(b), Rules 16(c) and (d), and Rules 17(a) and (c). The district court set aside all these rules, concluding as follows: that Rule 7(c) created liability for contract carriers where none would have previously existed; that Rules 16(a), 16(c), and 17(a) were not in conformity with section 40–11–105, 17 C.R.S. (1984); that the first sentence of Rule 16(b) created a presumption for which there was no support in the record; that Rule 16(d) was adopted without complying with the notice and hearing requirements of section 24–4–103, 10 C.R.S. (1982 & 1987 Supp.), of the Administrative Procedure Act, that no record was made with respect to the second sentence of Rule 16(d) in violation of section 24–4–103(4), 10 C.R.S. (1987 Supp.), of the Administrative Procedure Act, and that the second sentence was inconsistent with the prior decision of this court in *Denver–Climax Truck Line, Inc. v. Jim Chelf, Inc.*, 167 Colo. 69, 445 P.2d 399 (1968); and that Rule 17(c) was without any statutory basis in law for its promulgation.

The common carriers appeal from that part of the judgment approving the second sentence of Rule 16(b) and Rule 17(b), and the Commission and the common carriers appeal from that part of the judgment setting aside Rules 7(c), 16(a), the first sentence of 16(b), and Rules 16(c), 16(d), 17(a), and 17(c).

## II.

■ The Commission is vested with broad authority to regulate public utilities in Colorado, Colo. Const. art. XXV; § 40–3–102, 17 C.R.S. (1984), and is expressly empowered "to prescribe such reasonable rules and regulations covering the operations of contract carriers by motor vehicle as may be necessary for the effective administration of [the Contract Motor Carriers Act]." § 40–11–105(1), 17 C.R.S. (1984). Since this appeal involves a rulemaking, rather than an adjudicative proceeding, a brief review of the standard of

judicial review governing the Commission's rulemaking authority is appropriate.

In the absence of a statutory provision in the Public Utilities Law made expressly applicable to the Commission's rulemaking function, and in the further absence of any provision in the Public Utilities Law conflicting with the Administrative Procedure Act, the provisions of the Administrative Procedure Act will govern a rulemaking proceeding conducted by the Commission. *Home Builders Association v. Public Utilities Commission*, 720 P.2d 552, 559 (Colo. 1986). Since there is no special provision in the Public Utilities Law, §§ 40–1–101 to 40–33–109, 17 C.R.S. (1984 & 1987 Supp.), that either outlines specific statutory procedures to be followed by the Commission in performing its rulemaking function or that conflicts with the general rulemaking provisions of the Administrative Procedure Act, §§ 24–4–101 to –108, 10 C.R.S. (1982 & 1987 Supp.), it follows that the Administrative Procedure Act governs the rulemaking proceedings conducted by the Commission in this case. *See* § 24–4–102(3), 10 C.R.S. (1987 Supp.) ("agency" includes any state "commission").

Section 24–4–103 of the Administrative Procedure Act outlines the various procedures that an administrative agency or commission must follow in a rulemaking proceeding and, as pertinent here, states as follows:

(2) When rule-making is contemplated, public announcement thereof may be made at such time and in such manner as the agency determines, and opportunity may be afforded interested persons to submit views or otherwise participate informally in conferences on the proposals under consideration.

(3) Notice of proposed rule-making shall be published as provided in subsection (11) of this section and shall state the time, place, and nature of public rule-making proceedings which shall not be held less than twenty days after such publication, the authority under which the rule is proposed, and either the terms or the substance of the proposed rule or

a description of the subjects and issues involved.

(4) At the place and time stated in the notice, the agency shall hold a public hearing at which it shall afford interested persons an opportunity to submit written data, views, or arguments and to present the same orally unless the agency deems it unnecessary. Any proposed rule or revised proposed rule by an agency which is to be considered at the public hearing, together with a proposed statement of basis, specific statutory authority, and purpose and a proposed fiscal impact statement, shall be made available to any person at least five days prior to said hearing. The agency shall consider all submissions. The rules promulgated by the agency shall be based on the record which shall consist of proposed rules, evidence, exhibits, and other matters presented or considered, matters officially noticed, rulings on exceptions, any findings of fact and conclusions of law proposed by any party, and any written comments or brief filed. If no change is made, the agency may adopt said rule at the last public hearing. However, if any change is to be made therein, the agency ... shall announce at said public hearing the date of availability to any party of the incorporated change in the proposed final rule and shall afford any party to the public hearing at least four working days following the availability of such proposed final rule to submit written comments thereon prior to the adoption thereof. After consideration of the relevant matter presented, the agency shall incorporate by reference on the rules adopted a written concise general statement of their basis, specific statutory authority, and purpose....

§ 24–4–103(2), (3), and (4), 10 C.R.S. (1982 & 1987 Supp.). These statutory rulemaking requirements, however, are not applicable to "interpretative rules or general statements of policy, which are not meant to be binding as rules, or rules of agency organization." § 24–4–103(1), 10 C.R.S. (1982).

In acknowledging that the purpose of a rulemaking proceeding is to afford interested persons an opportunity to submit written data, views, or arguments on a proposed rule, we have held that it is not incumbent on the rulemaking agency to present evidence in support of the proposed rule. *Colorado Auto & Truck Wreckers Association v. Department of Revenue,* 618 P.2d 646, 652 (Colo.1980). This is especially so in those proceedings in which the proposed rule involves a policy judgment relating to the effective implementation of a statutory purpose, as distinguished from the resolution of controverted questions of fact. *Citizens For Free Enterprise v. Department of Revenue,* 649 P.2d 1054, 1063 (Colo.1982). As long as a proposed rule involving a policy judgment is made part of the record and there is a rational basis for the agency's action, the agency can choose to reject any adverse submissions and adopt the proposed rule. *Id.* Rules adopted pursuant to a statutory rulemaking proceeding are presumed valid and the burden is upon the challenging party to establish their invalidity by demonstrating that the rulemaking body acted in an unconstitutional manner, exceeded its statutory authority, or otherwise acted in a manner contrary to statutory requirements. § 24–4–106(7), 10 C.R.S. (1982); *see Augustin v. Barnes,* 626 P.2d 625, 627 (Colo. 1981); *Moore v. District Court,* 184 Colo. 63, 67, 518 P.2d 948, 951 (1974).

It is in light of these general guidelines that we first consider the challenges of the common carriers to the second sentence of Rule 16(b) and Rule 17(b), which rules were upheld by the district court, and then the Commission's and the common carriers' arguments relative to Rule 7(c), Rule 16(a), the first sentence of Rule 16(b), Rules 16(c) and (d), and Rules 17(a) and (c), all of which were set aside by the district court.

## III.

The common carriers contend that the district court erred in upholding second sentence of Rule 16(b), which pertains to rates and charges, and Rule 17(b), which governs the filing of tariffs with the Commission. The district court held that

both rules comported with section 40–11–105(2), 10 C.R.S. (1984), which empowers the Commission to prescribe minimum rates for contract carriers competing with common carriers, and that the record supported the Commission's determination that a contract carrier would be competing against the lower of a common carrier single line rate or a common carrier joint line rate. The common carriers argue that the district court erred in so ruling for two reasons: first, the second sentence of Rule 16(b) permits a competing contract carrier to charge no less than the single line rate if that rate is less than a joint line rate between the same points,[3] thus permitting unfair competition against common carriers in violation of section 40–11–105(2), 17 C.R.S. (1984), by underpricing the joint line rate for common carriers; and that Rule 17(b) violates the same statute by requiring a contract carrier to file tariffs of rates that are not less than the lowest rate prescribed for competing common carriers, thereby allowing a contract carrier to file a tariff of rates less than the rate charged by a higher priced, competing common carrier. We find these claims devoid of merit.

In 1967 the General Assembly replaced the former policy of "regulated monopoly" with the doctrine of "regulated competition." *Denver Cleanup Service, Inc. v. Public Utilities Commission*, 192 Colo. 537, 540–41, 561 P.2d 1252, 1254 (1977); *see* ch. 433, sec. 1, § 115–9–5(2), 1967 Colo. Sess.Laws 974 (currently codified at § 40–10–105(2), 17 C.R.S. (1984)). The controlling factor underlying this change in doctrine is the public interest in fostering a system of regulated competition, rather than regulated monopoly, between common carriers involved in the transportation of property along the same route or within the same territory. *See generally Miller Brothers, Inc. v. Public Utilities Commission*, 185 Colo. 414, 423–24, 431–32, 525 P.2d 443, 447–48, 451–52 (1974). The doctrine of regulated competition thus contemplates the possibility of more than one rate being set for competing common carriers operating along the same route or within the same territory.[4]

While section 40–11–105(2), 17 C.R.S. (1984), forbids a contract carrier from engaging in unfair competition in order to destroy or impair the service or business of a common carrier, it also vests the Commission with authority "to prescribe minimum rates, fares, and charges to be collected by contract carriers when competing with ... common carriers, which rates, fares, and charges shall not be less than the rates prescribed for ... common carriers for substantially the same or similar service." The second sentence of Rule 16(b) proceeds from an obvious recognition of the fact that the focus of the competition between a contract carrier providing substantially the same or similar service as a common carrier and the common carrier with whom the contract carrier is competing will be on the lower of the single line or joint line rates of the common carriers. The Commission's determination in this respect was informed by the testimony of Ralph Knull, the Chief of the Commission's Transportation Section, who stated that the contract carrier, in competing for some of the common carrier's business, will actually be competing against that common carrier charging the lower rate.[5] In keeping with this informed

---

3. A "single line" service is a through service between two points provided by a single carrier. A "joint line" service is rendered jointly by two or more carriers by interchanging freight at one or more intermediate points along the service route. *See, e.g., United States v. Pierce Auto Freight Lines, Inc.,* 327 U.S. 515, 66 S.Ct. 687, 90 L.Ed. 821 (1946).

4. The common carriers point out that the Commission in 1977 rejected the argument that regulated competition required the Commission to prescribe different rates for carriers rendering the same service. *See* PUC Decision No. 90101 (Feb. 1, 1977). However, the Commission is not estopped from reaching a different conclusion in a subsequent proceeding. *See, e.g., Colorado Ute Electric Association, Inc. v. Public Utilities Commission,* 198 Colo. 534, 540–41, 602 P.2d 861, 865 (1979) (Commission not bound by its prior decisions or by any doctrine similar to *stare decisis* ); *B & M Service, Inc. v. Public Utilities Commission,* 163 Colo. 228, 232–34, 429 P.2d 293, 295–96 (1967) (doctrines of *stare decisis* and equitable estoppel generally not applicable to decisions of administrative tribunals).

5. Ralph Knull testified as follows:
I guess it is my opinion that if we do have two levels of rates prescribed for common

determination, the second sentence of Rule 16(b) establishes the manner in which the minimum rate for a contract carrier competing with a common carrier is to be determined in those situations in which there is more than one rate for common carriers operating between the same points. Rule 17(b), in similar fashion, requires a contract carrier competing with any scheduled common carrier to file a tariff of rates and charges not less than the lowest rate prescribed for any competing common carrier providing substantially the same or similar service.

In light of the public interest in regulated competition and the Commission's responsibility to provide the common carrier with some protection against the competitive advantages of the contract carrier, *see Public Utilities Commission v. Stanton Transportation Co.*, 153 Colo. 372, 377–78, 386 P.2d 590, 593 (1963),[6] we view Rule 16(b) and Rule 17(b) as the legitimate products of the Commission's rulemaking authority "to prescribe minimum rates, fares, and charges to be collected by contract carriers when competing with . . . common carriers." § 40–11–105(2), 17 C.R.S. (1984). Neither the second sentence of Rule 16(b) nor Rule 17(b) fosters discriminatory or unfair competition by contract carriers against common carriers. On the contrary, both rules are consistent with the doctrine of regulated competition and are in accord with the Commission's statutory authority to prescribe minimum rates for contract carriers not less than the rates prescribed for common carriers providing substantially the same or similar service. We accord-

ingly affirm that part of the district court's judgment approving the second sentence of Rule 16(b) and Rule 17(b).

## IV.

We next consider the Commission's and the common carriers' claims relating to that part of the judgment which set aside the following rules challenged in the district court by the contract carriers: Rule 7(c), Rule 16(a), the first sentence of Rule 16(b), Rule 16(c), and Rules 16(d), 17(a), and 17(c).

## A.

■ Rule 7(c), which pertains to equipment, provides in relevant part that a contract carrier which permits another person, firm, or corporation to operate vehicles under the contract carrier's permit, either with or without the authorization of the Commission, "shall be responsible for any violations of the public utilities law or any of the rules and regulations of the Commission committed by such user." In setting aside this rule, the district court held that the effect of the rule was to create a liability for a permittee in situations where liability would not otherwise exist. The Commission and the common carriers claim that the district court misinterpreted the effect of Rule 7(c), and we agree.

In construing an administrative rule, we apply those basic rules of interpretation which pertain to the construction of a statute. *International Brotherhood of Electrical Workers v. Hawaiian Telephone Co.*, 713 P.2d 943, 950 (Haw.1986); *Higgin-*

---

carriers, one being, say, substantially higher than the other, the only carrier that that contract carrier will truly be competing with, in my interpretation of competing, is that lower rated carrier, because for example if the rate is $1 by carrier A, and has been prescribed at that level, one dollar and a half for carrier B, I think that the contract carrier when attempting to get some of that traffic is really competing with the carrier that has the dollar rate.

6. Although the common carriers focus on some of our prior decisions for the proposition that protection of common carrier operations is a central purpose of the Contract Motor Carriers Act, *see DeLue v. Public Utilities Commission*, 169 Colo. 159, 454 P.2d 939, *cert. denied*, 396

U.S. 956, 90 S.Ct. 428, 24 L.Ed.2d 421 (1969); *Public Utilities Commission v. Stanton Transportation Co.*, 153 Colo. 372, 386 P.2d 590 (1963); *McKay v. Public Utilities Commission*, 104 Colo. 402, 91 P.2d 965 (1939), both the Act and our cases make clear that "the business of contract carriers by motor vehicle is affected with a public interest." § 40–11–103, 17 C.R.S. (1984); *see Stanton Transportation Co.*, 153 Colo. at 376, 386 P.2d at 594. The protection of common carriers, therefore, is not an end in itself but a means of promoting the public interest in the coordination of common carrier and contract carrier operations in such a way as not to impair the public's access to common carrier service at reasonable rates.

*son v. Westergard*, 100 Idaho 687, 604 P.2d 51, 54–55 (1979); *see generally* 1A N. Singer, *Sutherland Statutory Construction* § 31.06 (Sands 4th ed. 1985). We look first to the language of the rule and attribute to the words and phrases used therein their plain and ordinary meaning. *See, e.g., Colorado Common Cause v. Meyer*, 758 P.2d 153, 160 (Colo.1988); *People v. Guenther*, 740 P.2d 971, 975 (Colo.1987). By its plain terms, Rule 7(c) applies to those situations in which a contract carrier permits another "to operate vehicles under his or its permit." The rule is obviously directed to those situations in which the contract carrier has retained its permit but is allowing others to operate its vehicles.

By specifying that contract carriers cannot avoid their obligations simply by allowing another to operate their vehicles, Rule 7(c) does not create any new liability for contract carriers. Contract carriers are subject to the provisions of the Contract Motor Carriers Act and to reasonable terms and conditions included in the permit. § 40–11–103(1), 17 C.R.S. (1984). Rule 7(c) simply ensures that the contract carrier will remain responsible for those operating its vehicles under the contract carrier's permit, whether such operation is with or without the authorization of the Commission. Since Rule 7(c) creates no new liability for contract carriers, we reverse that part of the judgment setting aside the rule.

### B.

■ Rule 16(a) contains two sentences, the first of which provides that every contract carrier "competing with" any common carrier shall charge not less than the minimum rate applicable to such contract carrier, and the second of which states that the minimum rate "shall not be less than the rates prescribed by the Commission for motor vehicle common carriers for substantially the same or similar service." In setting aside Rule 16(a), the district court concluded that it was not in conformity with section 40–11–105(2), 17 C.R.S. (1984), which expressly vests the Commission with power to prescribe minimum rates "to be collected by contract carriers when competing with duly authorized motor vehicle common

carriers, which rates ... shall not be less than the rates prescribed for motor vehicle common carriers for substantially the same or similar service." Specifically, the district court held that the first sentence of Rule 16(a) failed to incorporate the statutory terminology "substantially the same or similar service," and that the second sentence contained no reference to the "competing with" language of the statute. The Commission and the common carriers argue that the rule must be read as a whole and, when so read, is in accord with section 40–11–105(2). We agree with their argument.

■ The provisions of an administrative rule should be read in connection with and relation to each other, so that the rule itself may be interpreted as a whole. *See Doenges-Glass, Inc. v. General Motors Acceptance Corp.*, 175 Colo. 518, 522, 488 P.2d 879, 881 (1971); *People ex rel. Marks v. District Court*, 161 Colo. 14, 21–22, 420 P.2d 236, 240 (1966). When the two sentences of Rule 16(a) are read in relation to each other, the sense of the rule is that contract carriers competing with duly authorized motor vehicle common carriers must charge no less than the minimum rate prescribed by the Commission for common carriers providing substantially the same or similar service. That this interlocking and contextual interpretation was intended by the Commission is evident from the repetitive phrase "the minimum rates and charges" in the rule. This phrase initially appears near the end of the first sentence of Rule 16(a) and then again appears at the beginning of the second sentence, thus serving as a connecting link between both sentences of the rule. We thus conclude that Rule 16(a) is not in fatal conflict with section 40–11–105(2), and we accordingly reverse that part of the judgment setting aside Rule 16(a).

### C.

■ The district court also set aside the first sentence of Rule 16(b), which states that a contract carrier, when competing with any two or more connecting common

carriers which are providing substantially the same or similar service, shall not charge less than the minimum rates prescribed by the Commission for "any such joint tariff applicable to the points served." The district court ruled that, since the next sentence of Rule 16(b) states that if a single line rate is in effect for a scheduled common carrier between the same points, then the single line rate if less than the joint line rate shall be the minimum for the contract carrier, the challenged language in the first sentence of Rule 16(b) created a presumption that "two or more connecting common carriers which are able to provide only a joint line service are 'competing with' a contract carrier which is able to provide a single line service," and that no factual basis existed in the record for such a presumption. The Commission and the common carriers assert that the rule contains no such presumption, and we agree with their assertion.

The plain language of the first sentence of Rule 16(b) belies the notion that any *presumption* of competition is created with respect to two or more connecting common carriers providing only a joint line service. This sentence simply states what the contract carrier's minimum rate shall be when in fact that contract carrier is "competing with two or more connecting motor vehicle common carriers" providing substantially the same or similar service. The formulation of the administrative standard for fixing a minimum rate, which is precisely what Rule 16(b) does, is in line with the Commission's statutory duty imposed by section 40–11–105(2) to prescribe minimum rates that shall "not be less than the rates prescribed for motor vehicle common carriers for substantially the same or similar service." We therefore reverse that part of the judgment setting aside the first sentence of Rule 16(b).

### D.

■ The district court also set aside Rule 16(c), which authorizes the Commission to change, after a hearing, "any tariff or rate of any contract carrier competing with a motor vehicle common carrier providing substantially the same or similar

service," and further authorizes the Commission to "fix the actual rates to be charged by any contract carrier." The district court ruled that section 40–11–105(3), 17 C.R.S. (1984), which is the statutory source of the rule, nowhere uses the term "actual rates" in authorizing the Commission to prescribe minimum rates. The Commission and the common carriers claim that the district court erred in holding that the fixing of "actual rates" is beyond its authority to prescribe "minimum rates." We agree with their contention.

Section 40–11–105(3) gives the Commission "full power to change, amend, or alter any such tariff or, after hearing, *fix the rates* of any contract carrier ... competing with a motor vehicle common carrier." (Emphasis added). Supplementing this statute is section 40–11–105(1), 17 C.R.S. (1984), which vests the Commission with power "to prescribe such reasonable rules and regulations covering the operations of contract carriers by motor vehicle as may be necessary for the effective administration" of the Contract Motor Carriers Act. The Commission's specific statutory authorization to "fix the rates" conferred by section 40–11–105(3) and the broad power vested in the Commission by section 40–11–105(1) constitute a sufficient warrant for the Commission to set "actual rates" for contract carriers competing with common carriers providing substantially the same or similar service.

Rule 16(c) is consistent with the legislative intent of the Contract Motor Carriers Act and neither modifies nor conflicts with the overall statutory scheme. We accordingly reverse that part of the judgment setting aside Rule 16(c).

### E.

The district court also set aside Rule 16(d), which consists of two sentences. The first sentence provides that a contract carrier shall be deemed to be in competition with a common carrier providing substantially the same or similar service "when regular route, scheduled, line haul, common carrier service is available for the same or

similar commodities between the same points and locations proposed in the application for a permit." The second sentence of Rule 16(d) states that, although properly includable among the factors to be considered in determining whether the services of contract carriers are distinctly different or superior to the services of common carriers,

> the fact that a contract carrier provides distinctly different or superior service to that offered by authorized common carriers by providing, for example, more frequent service, 24–hour service, ancillary non-transportation services, or a service to a particular location, for example, does not necessarily render the service of the contract carrier noncompetitive.

The district court offered the following three reasons for setting aside Rule 16(d): the hearing officer added part (d) of Rule 16 in his recommended decision, and the Commission adopted a modified version of the rule, without complying with the provisions of the Administrative Procedure Act concerning notice and an opportunity for comment on the rule, § 24–4–103(3) and (4), 10 C.R.S. (1982 & 1987 Supp.); no record was made with respect to the second sentence of the rule in violation of section 24–4–103(4), 10 C.R.S. (1982 & 1987 Supp.); and the rule was inconsistent with this court's decision in *Denver–Climax Truckline*, 167 Colo. 69, 445 P.2d 399.[7] We conclude that the Commission acted within its administrative authority in adopting Rule 16(d) as an "interpretative" rule and that such rule is not inconsistent with *Denver–Climax Truck Line*.

### 1.

We first consider that part of the district court's ruling which set aside Rule 16(d)

because the Commission failed to provide interested persons with adequate notice and opportunity for comment in violation of section 24–4–103(3) and (4), and because the Commission disregarded the requirement of section 24–4–103(4) that a rule be based on the record made at the rulemaking hearing. Section 24–4–103(1) states that "[e]xcept when notice or hearing is otherwise required by law, this section does not apply to interpretative rules or general statements of policy, which are not meant to be binding as rules, or rules of agency organization." We have not previously had occasion to construe this exception in the context of the notice and hearing requirements of the Administrative Procedure Act. Because the "interpretative" rule exception of section 24–4–103(1) parallels the "interpretative" rule provision of the Federal Administrative Procedure Act, *see* 5 U.S.C. § 553(b)(A) (1982), we may consider federal precedent and other commentary on the federal counterpart to section 24–4–103(1). *See, e.g., People v. Riley*, 708 P.2d 1359, 1363 (Colo.1985); *Millis v. Board of County Commissioners*, 626 P.2d 652, 657 (Colo. 1981); *United Bank v. Shavlik*, 189 Colo. 280, 282, 541 P.2d 317, 318 (1975).

An administrative rule based on an agency's statutory authority to promulgate a substantive standard that carries the force of law is a "legislative" or "substantive" rule. *Batterton v. Marshall*, 648 F.2d 694, 701 (D.C.Cir.1980); *see generally* 2 K. Davis, *Administrative Law Treatise* § 7:8 (2d ed. 1979). An "interpretative" rule, in contrast, serves the advisory function of explaining the meaning of a word or phrase in a statute or other rule, and describes the type of factors which an agency will consider in future administrative pro-

---

7. In setting aside Rule 16(d), the district court stated that "there is no need to determine whether the second sentence of this Rule also violates the requirements of § 24–4–103(8)(d), C.R.S. (1987 Supp.), which statute generally requires a fiscal impact statement if a rule amendment has fiscal implications." We note in passing that with respect to section 24–4–103(8)(d), 10 C.R.S. (1987 Supp.), the issue which the contract carriers argued to the district court related to possible fiscal consequences to the contract carriers. By the plain language of section 24–4–103(8)(d), 10 C.R.S. (1987 Supp.), a fiscal impact statement is required only "[w]here the rule or amendment to an existing rule will have a fiscal impact *on the state or any of its political subdivisions.*" (Emphasis added). The contract carriers did not contend that the state would experience a fiscal impact as a result of Rule 16(d), and nothing in the record suggests that the Commission could reasonably have concluded that the rule would create a fiscal impact on the state or any of its political subdivisions.

ceedings without, however, binding the agency to a particular result. *Batterton,* 648 F.2d at 705; *see Burroughs Wellcome Co. v. Schweiker,* 649 F.2d 221, 224–25 (4th Cir.1981) (distinguishing "general statement of policy" from substantive rule); *Assure Competitive Transportation, Inc. v. United States,* 635 F.2d 1301, 1307 n. 6 (7th Cir.1980) (same); *Regular Common Carrier Conference v. United States,* 628 F.2d 248, 251 (D.C.Cir.1980) (same). Even when an agency acts under delegated statutory authority to make a legislative rule, however, a rule may still be an interpretative rule as long as it serves the explanatory or interpretative function characteristic of such a rule. *See, e.g., Louisiana–Pacific Corp. v. Block,* 694 F.2d 1205, 1209–10 (9th Cir.1982); 2 K. Davis, *Administrative Law Treatise, supra,* § 7:8.

 An agency's own characterization of a particular rule is some indication of the nature of the rule itself. *See Louisiana–Pacific,* 694 F.2d at 1210; *Pacific Gas & Electric Co. v. Federal Power Commission,* 506 F.2d 33, 39 (D.C.Cir. 1974). In the instant case, the hearing examiner explained that he was adding part (d) to Rule 16 in order to alleviate some of the difficulty which contract carriers might otherwise have in determining what constitutes competition with common carriers providing substantially the same or similar service.[8] The hearing examiner thus made clear during the rulemaking proceeding itself that Rule 16(d) was intended to clarify and explain the meaning of the term "competition" as used in the public utility statutes and the Commission's rules. The Commission, in ruling on the excep-

tions filed to the hearing examiner's recommended decision, also stated that Rule 16(d) was intended to set forth those factors that may be appropriately considered in determining whether a contract carrier is engaging in competition with a common carrier providing substantially the same or similar service. Considering the text of the second sentence of Rule 16(d), which is basically explanatory of the meaning of the term "competition" as related to contract carriers and common carriers providing substantially the same or similar service, and in light of the statements of the hearing examiner and the Commission concerning the purpose of Rule 16(d), we are satisfied that the second sentence of the rule is interpretative in nature and falls within the express exception to the notice and hearing requirements of section 24–4–103.

 Furthermore, although section 24–4–103(4) requires an agency's adoption of a legislative or substantive rule to be "based on the record"—a record often consisting of evidence or other submissions offered in support of the rule—no such requirement exists for an interpretative rule. *Batterton,* 648 F.2d 700–04. An interpretative rule will be upheld as long as the agency's action was not arbitrary, capricious, or an abuse of discretion. *Assure Competitive Transportation,* 635 F.2d at 1306–07. That standard of review is highly deferential and requires approval of the agency's action if a rational basis exists for the agency's decision. *Id.* The hearing examiner's and the Commission's explanations of the reason for Rule 16(d) clearly provide

---

**8.** The hearing examiner recommended the following language for the second sentence of Rule 16(d):

> The fact that a contract carrier provides distinctly different or superior service to that offered by authorized common carriers by providing, for example, more frequent service, 24 hour service, ancillary non-transportation services, or direct service to a particular location, shall not render the contract carrier service noncompetitive.

With respect to this addition, the hearing examiner wrote the following in his recommended decision.

> [C]omments concerning the difficulty contract carriers have interpreting what is competition with motor vehicle common carriers providing substantially the same or similar service are well taken. It is the function of a rulemaking proceeding and ultimately the rules as adopted, to provide guidance to those regulated in interpreting statutory provisions. It is appropriate to provide definitions for the terms which are used in the statute and these rules. Accordingly, the relevant terms have been defined in the additional paragraph (d) contained in the rule, based on prior court cases and Commission decisions and should be adopted by this Commission.

a rational basis for the rule.[9]

### 2.

We turn then to consider whether the district court correctly concluded that the second sentence of Rule 16(d) was inconsistent with this court's decision in *Denver–Climax Truck Line*, 167 Colo. 69, 445 P.2d 399. In so concluding, the district court read *Denver–Climax Truck Line* as adopting a per se rule that a contract carrier providing an ancillary non-transportation service to the service provided by a common carrier is not competing as a matter of law with the common carrier and that,

therefore, Rule 16(d) clashed with the holding of that case. The district court's reading of *Denver–Climax Truck Line* was erroneous.

In *Denver–Climax Truck Line*, we determined that there was evidence in the record to support the Commission's determination that Jim Chelf, Inc., a contract carrier which transported concrete pipes to points served by a common carrier and provided the additional service of stringing the pipes along the proposed pipeline route, was not in competition with the common carrier, but rather was rendering a highly specialized service that was not substantial-

**9.** In holding that Rule 16(d) was validly adopted as an interpretative rule, we do not mean to imply that interested persons were not given adequate notice and opportunity for comment prior to the Commission's final adoption of the rule or that the rule itself was not based on the record made at the rulemaking hearing.

Section 24–4–103(4), 10 C.R.S. (1987 Supp.), provides that if any change is to be made to a proposed rule during the course of a public hearing, the agency "shall afford any party to the public hearing at least four working days following the availability of such proposed final rule to submit written comments thereon prior to the adoption thereof." The first sentence of Rule 16(d) states the general proposition that a contract carrier applying for a permit to transport the same or similar commodities as carried by the common carrier, and between the same points and locations as covered by the common carrier's regularly scheduled service, shall be in competition with the common carrier for that service. This aspect of "competition" between contract carriers and common carriers, which was discussed at some length by the Chief of the Commission's Transportation Service during the rulemaking proceeding, clearly relates to the provisions of Rules 16(a), (b), and (c), all of which deal with rates and charges for a contract carrier "competing with" a common carrier providing substantially the same or similar service. The second sentence of Rule 16(d) is similarly related to the "competition" aspect of Rule 16. As originally recommended by the hearing officer, the second sentence of Rule 16(d) stated that a contract carrier's service shall not be rendered noncompetitive with a common carrier by virtue of the fact that the contract carrier provides a distinctly different or superior service, such as "ancillary non-transportation services." The Commission changed the recommended second sentence of the rule to provide that, although includable "among the factors to be considered in determining whether or not the services of contract carriers are distinctly different or superior to those provided by authorized common carriers," the mere fact that a

contract carrier provides distinctly different or superior services, such as "ancillary non-transportation services ... does not necessarily render the service of the contract carrier noncompetitive." In effect, the second sentence of Rule 16(d) merely enumerates a list of factors that may be taken into consideration by the Commission and expressly states that no one of these factors will necessarily be dispositive on the issue of competition. The terms of Rule 16(d) may appropriately be viewed, therefore, as a change to proposed Rule 16 by the addition of an explanation of the term "competition" used in other parts of the rule. The record shows that the Commission provided all parties to the rulemaking proceeding twenty days in which to file exceptions to the hearing examiner's recommended decision. In addition to the twenty day period to file exceptions to the hearing officer's recommended decision, all parties were given a minimum of twenty days on three separate occasions to file applications for rehearing, reargument, or reconsideration pursuant to section 40–6–114(2) and (3) prior to the Commission's final adoption of the rules. One might well conclude, therefore, that all parties to the rulemaking proceeding were provided with notice and an adequate opportunity to comment on Rule 16(d) prior to the Commission's final adoption of the rule.

Furthermore, although the record is not a model of thoroughness with respect to the contents of Rule 16(d), it cannot be said that there is no basis whatever in the record for the Commission's adoption of the final version of the rule. As explained in note 8, *supra*, the hearing examiner stated that he was adopting Rule 16(d) in order to alleviate the difficulties experienced by contract carriers in determining the question of competition between themselves and common carriers providing substantially the same or similar service. The issue of competition was the center of focus throughout the rulemaking hearing. We would be hard put to conclude, under the full record before us, that the version of Rule 16(d) adopted by the Commission was not based on the record.

ly the same or similar to the service offered by the common carrier. In so holding, we acknowledged that there was contrary evidence on the issue of competition, but that this contrary evidence "posed a disputed issue of fact to be resolved by the Commission, and not the courts." *Id.* at 71, 445 P.2d at 400. The holding in *Denver–Climax Truck Line,* therefore, was clearly a fact-specific and record-dependent decision that cannot properly be characterized as a per se rule with respect to the effect of a contract carrier's "ancillary nontransportation services" on the issue of competition.

The second sentence of Rule 16(d) lists several factors which the Commission may appropriately consider in determining whether a contract carrier is competing with a common carrier, but expressly states that no one of these factors is necessarily conclusive on the issue of competition. The second sentence of Rule 16(d) is not inconsistent with our holding in *Denver–Climax Truck Line,* and we accordingly reverse that part of the judgment setting aside Rule 16(d).

### F.

■ In setting aside Rule 17(a), which requires a contract carrier to file "tariffs which clearly reveal the rates and charges being assessed for services performed," the district court ruled that Rule 16(c) made it clear that the rates referred to in Rule 17(a) were intended to be "actual rates" and that, therefore, as with Rule 16(c), Rule 17(a) was not in conformity with section 40–11–105, 17 C.R.S. (1984), which makes no mention of "actual rates." The Commission and the common carriers argue, and we agree, that the district court erred in holding that Rule 17(a) was not in conformity with the Commission's statutory authority.

Section 40–11–105(3) requires every contract carrier to file with the Commission "schedules showing rates, charges, and collections, collected or enforced or to be col-

lected or enforced, which in any manner affect or relate to the operations of any such contract carrier," and further requires contract carriers to make such filings "[u]nder such rules and regulations as the commission may prescribe." Rule 17(a) completely conforms to section 40–11–105(3) by specifying that contract carriers are to file "tariffs which clearly reveal the rates and charges being assessed for services performed." This filing requirement serves the function of providing the Commission with information concerning whether the contract carrier is violating section 40–11–105(3) by charging a rate less than the rate prescribed by the Commission. We thus reverse that part of the judgment setting aside Rule 17(a).

### G.

■ We last consider that part of the district court's judgment setting aside Rule 17(c), which provides that every Class B contract carrier,[10] when competing with a common carrier and transporting commodities other than those specifically listed in the rule, shall "charge and collect rates and charges which shall not be less than the percentage increment established by the Commission, which increment shall be greater than the rates prescribed [in the Commission's ongoing rate docket] for the scheduled common carrier or carriers, but in no case more than 20 percent greater." The district court set aside Rule 17(c) because, in the court's view, it results in imposing a penalty on contract carriers and thereby constitutes an unlawful extension of the provisions of section 40–11–105(2), 17 C.R.S. (1984). The Commission and the common carriers contend, and again we agree with their claim, that Rule 17(c) does not unlawfully extend the provisions of section 40–11–105(2), but merely effectuates the purpose of the Contract Motor Carriers Act by controlling the detrimental effect of contract carrier operations upon common carrier operations.

---

**10.** A "Class B contract carrier" is defined to "embrace all contract carriers by motor vehicle which do not operate over substantially regular or established routes or between substantially fixed termini." § 40–11–101(9)(b), 17 C.R.S. (1984).

Section 40–11–105(2) vests the Commission with the authority "to prescribe minimum rates, fares, and charges" for contract carriers when competing with common carriers, and expressly provides that such "rates, fares, and charges shall not be less than the rates prescribed for motor vehicle common carriers for substantially the same or similar service." Nothing in this statutory language prohibits the Commission from prescribing rates for contract carriers higher than the minimum rates prescribed for common carriers, nor does that statute prohibit the Commission from calculating those rates on the basis of a percentage increment in excess of the rates prescribed for competing common carriers. *See Denver–Laramie–Walden Truck Line, Inc. v. Denver–Fort Collins Freight Service, Inc.*, 156 Colo. 366, 370, 399 P.2d 242, 243–44 (1965) (Commission has duty of setting reasonable rates for competing contract carrier "which could be no lower than common carrier rates, but which could be higher.").

Although the record in this case does not conclusively establish that twenty percent is the appropriate increment in setting the rate for Class B contract carriers, the record does contain testimony outlining the long history of the twenty percent increment. Moreover, the hearing examiner took official notice of three earlier rate-setting decisions in which the Commission had imposed the twenty percent increment. *See, e.g., PUC Decision No. 7118*, at 23 (Feb. 25, 1936) ("[A]ll Class B [contract] carriers ... in competition with any duly authorized common carrier shall charge and collect rates ... at least 20 percent higher than the class rates prescribed....").

One of the purposes of the Contract Motor Carriers Act is to provide some protection to common carriers against the vicissitudes of their unfavorable competitive position relative to contract carriers. *See, e.g., McKay v. Public Utilities Commission*, 104 Colo. 402, 413, 91 P.2d 965, 970 (1939). The percentage increment in Rule 17(c) represents a continuation of a reasonable and long-standing practice calculated to control the potentially detrimental effect that contract carrier operations might have on common carrier operations. *See Public Utilities Commission v. Stanton Transportation Co.*, 153 Colo. 372, 377–78, 386 P.2d 590, 593 (1963). The rule finds support both in the statutory ratemaking authority vested in the Commission by section 40–11–105(3) and in the testimony and other submissions made at the rulemaking proceeding. We therefore reverse that part of the district court judgment setting aside Rule 17(c).[11]

### V.

In summary, we affirm that part of the judgment approving the second sentence of Rule 16(b) and Rule 17(b). We reverse that part of the judgment setting aside Rule 7(c), Rule 16(a), the first sentence of Rule 16(b), Rule 16(c), Rule 16(d), Rule 17(a), and Rule 17(c).

**11.** The district court also found Rule 17(c) to be unlawful "under the provisions of § 24–4–103(7), C.R.S. (1982), of the State Administrative Procedures Act." Since subsection 24–4–103(7) pertains to the right to petition for the issuance, amendment, or repeal of a rule, we presume that the court intended to refer to subsection 24–4–103(8)(a), which provides:

No rule shall be issued except within the power delegated to the agency and as authorized by law. A rule shall not be deemed to be within the statutory authority and jurisdiction of any agency merely because such rule is not contrary to the specific provisions of a statute. Any rule or amendment to an existing rule issued by any agency, including state institutions of higher education administered pursuant to title 23, C.R.S. 1973, which conflicts with a statute shall be void.

Because we conclude that the Commission did act within its delegated power as authorized by law, and that Rule 17(c) does not conflict with a statute, section 24–4–103(8)(a) has not been violated.